**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KAIBAB BAND OF PAIUTE INDIANS;<br><br>PAIUTE INDIAN TRIBE OF UTAH;<br><br>UTE MOUNTAIN UTE TRIBE;<br><br>*Plaintiffs*,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States;<br><br>DOUG BURGUM, in his official capacity as Secretary of the Interior;<br><br>STEVAN PEARCE, in his official capacity as Director of the Bureau of Land Management;<br><br>*Defendants*. | Case No. 26-cv-4094 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Since time immemorial, the Grand Staircase-Escalante National Monument ("Grand Staircase" or "the Monument") landscape has been part of the Kaibab Band of Paiute Indians', Paiute Indian Tribe of Utah's, and Ute Mountain Ute Tribe's (collectively "Tribal Nations" or "Plaintiffs") ancestral homelands. Located in southern Utah, Grand Staircase is a living landscape that holds the Tribal Nations' sacred places, plant medicines, cultural resources, and histories. The Tribal Nations are governed by principles that require them to protect Grand Staircase for their next generations.

2. The Tribal Nations bring this lawsuit to challenge President Trump's unlawful attempt to undeclare Grand Staircase Escalante National Monument. President Trump has attempted to undeclare Grand Staircase by presidential proclamation on two separate occasions. In 2017, President Trump issued Proclamation 9682, which purported to shrink Grand Staircase by 860,000 acres and open the excised lands to oil and gas drilling, critical mineral mining, and off-road vehicle use. 82 Fed. Reg. 58089 (Dec. 4, 2017) ("2017 Dismantling Proclamation"). Conservation organizations sued to stop the proclamation's implementation, and, in 2021, President Biden restored Grand Staircase to its original boundaries through Proclamation 10286. 86 Fed. Reg. 57335 (Oct. 15, 2021) ("2021 Restoration Proclamation"). But in July 2026, President Trump issued a second proclamation ("2026 Dismantling Proclamation"), again attempting to revoke Grand Staircase's national monument designation. President Trump's second proclamation purports to

shrink Grand Staircase from 1.9 million acres to roughly 181,000 acres, approximately 10% of its original size. If upheld, Grand Staircase will be left as a remnant of what it was and protections for the Tribal Nations' sacred places and their cultural and natural resources will be virtually eliminated.

3. Grand Staircase is a desert landscape of deep sandstone canyons, limitless rolling hills, arid badlands, sweeping arches, and high plateaus. To the Tribal Nations, Grand Staircase is like nowhere else. Often recognized as a "laboratory" for its scientific value, Grand Staircase is more than a research site to the Tribal Nations. Grand Staircase is inseparable from the Tribal Nations' cultures, histories, and identities. It is where the Tribal Nations' ancestors are buried, where their citizens travel to pray and to gather plants and medicines necessary for religious ceremonies, and where their identity is intertwined with the landscape's geographical features.

4. When President Clinton first declared Grand Staircase a national monument in 1996, it was already threatened by extractive resource development, including plans for a large-scale coal mine in the heart of the Monument. Grand Staircase's national monument designation ended those threats and protected the landscape for nearly 21 years.

5. The 2026 Dismantling Proclamation revives these threats and risks permanently severing the Tribal Nations' sacred connections to Grand Staircase. The 2026 Proclamation undeclares roughly 1.7 million acres central to the Tribal Nations' cultural, religious, and traditional practices and wellbeing. For the Tribal Nations,

Grand Staircase is alive with the prayers of their ancestors. It is where Southern Paiute ceremonial songs connect the people to the landscape, where the Tribal Nations bring their youth to teach them about how to care for culturally significant springs, and where Southern Paiute people are close to their ancestors.

6. The Tribal Nations challenge the 2026 Dismantling Proclamation as a direct violation of the United States Constitution, the Antiquities Act of 1906, and the Administrative Procedure Act. Through the Antiquities Act, Congress granted the President limited authority: to declare national monuments. Nowhere in the text of the Act does Congress grant the President the authority to undeclare, diminish, revoke, or dissolve national monuments once established. Had Congress wanted to grant the President that authority, it could have done so in the text of the Act, but it did not. Instead, Congress granted the President the power to protect places like Grand Staircase for future generations, so everyone—including Tribal Nations—can enjoy them.

7. The Tribal Nations respectfully ask the Court to declare Defendants' actions unlawful and to enjoin Agency Defendants from implementing the 2026 Dismantling Proclamation.

**JURISDICTION AND VENUE**

8. This action arises under the Antiquities Act and Articles I, II, and IV of the United States Constitution. This action also arises under sections 701 through 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Jurisdiction is therefore proper pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

9. This Court also has jurisdiction pursuant to 28 U.S.C. § 1362, which provides that "district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

10. Defendants lack sovereign immunity because their actions giving rise to this suit were ultra vires. The APA also waives sovereign immunity in this action. 5 U.S.C. § 702.

11. This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and its inherent authority to issue equitable relief. Injunctive relief is also authorized for claims under sections 705 through 706 of the APA.

12. Venue is proper pursuant to 28 U.S.C. § 1391 because Defendants reside in this judicial district and because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

**PLAINTIFFS**

13. Plaintiff KAIBAB BAND OF PAIUTE INDIANS ("Kaibab Band") is a sovereign Tribal Nation and a federally recognized Indian Tribe. *See* 91 Fed. Reg. 4102, 4104 (Jan. 30, 2026). The Kaibab Band's reservation is in Arizona near the southern Utah border. The Kaibab Band's seat of government is Fredonia, Arizona.

14. Plaintiff PAIUTE INDIAN TRIBE OF UTAH is a sovereign Tribal Nation and a federally recognized Indian Tribe, *see* 91 Fed. Reg. at 4104, whose

present-day reservation lands consist of 10 separate parcels located in southwestern Utah. The Paiute Indian Tribe of Utah's seat of government is Cedar City, Utah.

15. Plaintiff UTE MOUNTAIN UTE TRIBE ("Ute Mountain Ute") is a sovereign Tribal Nation and a federally recognized Indian Tribe, *see* 91 Fed. Reg. at 4105, whose present-day reservation lands were established by the 1868 Treaty with the Ute. 15 Stat. 619 (Mar. 2, 1868). Ute Mountain Ute's reservation, Tribal lands, and fee patent lands are located in Utah, Colorado and New Mexico. Individual Ute Mountain Ute members own allotments in Utah. The Ute Tribes signed earlier treaties with the United States in 1849, 1863, and 1868. Ute Mountain Ute's seat of government is Towaoc, Colorado.

**DEFENDANTS**

16. Defendant DONALD J. TRUMP is sued is his official capacity as President of the United States. He currently resides and performs his duties in Washington, D.C.

17. Defendant DOUG BURGUM is sued in his official capacity as the Secretary of the Interior of the United States. In that capacity, he is responsible for ensuring that the Department of the Interior and its constituent agencies, including BLM, comply with the 2026 Dismantling Proclamation's direction and requirements regarding the management of Grand Staircase. Secretary Burgum performs his duties in Washington, D.C.

18. Defendant STEVAN PEARCE is sued in his official capacity as the Director of the Bureau of Land Management within the Department of the Interior.

In that capacity, he is responsible for ensuring that BLM complies with the 2026 Dismantling Proclamation's direction and requirements regarding the management of Grand Staircase. Director Pearce performs his duties in Washington, D.C.

19. Collectively, Donald J. Trump, Doug Burgum, and Stevan Pearce are "Defendants" and Doug Burgum and Stevan Pearce are "Agency Defendants."

20. Defendants have the authority, ability, and obligation to remedy the harms to the Tribal Nations.

## BACKGROUND

### I. Overview of Historic Native American Connections to Grand Staircase

21. Grand Staircase is part of the Tribal Nations' ancestral homelands.

22. The Monument lies within the larger region called the Colorado Plateau and is comprised of three distinct geographic sections: Grand Staircase, the westernmost section; Kaiparowits Plateau, the center of the three sections; and Escalante River Basin, the easternmost section.

23. In 1996, President Clinton issued Proclamation 6920, which established Grand Staircase. 61 Fed. Reg. 50223 (Sept. 18, 1996) ("Clinton Proclamation"). Grand Staircase encompassed approximately 1.7 million acres.

24. Since then, Congress has twice added to Grand Staircase's acreage, and today Grand Staircase is the United States' largest national monument, encompassing 1.9 million acres. *See* Utah Schools and Lands Exchange Act, Pub. L. No. 105-335, § 3, 112 Stat. 3139, 3141 (1998) ("Utah Lands Act"); Automobile National

Heritage Area Act, Pub. L. No. 105-355, § 110, 112 Stat. at 3247, 3252-53 ("Automobile Act").

25. Native Americans, including the Tribal Nations and their citizens, have profound spiritual, cultural, and historic connections to the region. *See*, *e.g.*, BLM, Grand Staircase-Escalante National Monument Proposed RMP and Final Env't Impact Statement, vol. 3, app. at I-57 (2025) ("FEIS"), *available at* https://eplanning.blm.gov/documents/?id=91d264cd-a7f2-f011-8406-001dd80ef717&spid=8fe7277f-a8f2-f011-8407-001dd80db62a.

26. While Grand Staircase "was the last place in the continental United States to be mapped" by Western scientific standards, 61 Fed. Reg. at 50223, Grand Staircase has been mapped since time immemorial by Southern Paiute ceremonial songs that are still sung today.

27. The Tribal Nations and their ancestors have lived in and cared for the region since time immemorial. Their enduring presence is evidenced by the trails traversing the Kaiparowits Plateau, pit houses, lithic and ceramic remnants, petroglyphs, pictographs, and wikiups found throughout the Monument. FEIS, vol. 3, app. at I-53, I-59.

28. The Kaiparowits Plateau derives its name from a Southern Paiute word for the Kaiparowits band of the Southern Paiute—an early band that called the area home.

29. Numerous places spread throughout Grand Staircase have been historically used, and are still used, by the Tribal Nations and their citizens "for

natural resources gathering, hunting subsistence, travel routes, and spiritual and religious ceremonies," among other uses. FEIS, vol. 3, app. at I-57.

30. Some of the Monument's historically and culturally significant places "may be manifested as physical remains on the ground, such as archaeological and historic sites," and catalogued as traditional cultural properties; "however, many are topographic features and landforms, natural resources, or resources of concern and use that are only evident in oral traditions." *Id.*

31. The ancestral population of the Grand Staircase landscape is demonstrated, in part, by the remains of cultural material from Ancestral Puebloans and Fremont culture. FEIS, vol. 3, app. at I-53.

32. Most of the Ancestral Puebloans moved to south and east approximately seven hundred years ago. However, significant concentrations of their presence can be found in areas of the Monument such as the Circle Cliffs, Hackberry Canyon, Buckskin Mountain, the Upper Escalante Canyons, and Fiftymile Mountain in the eastern portion of the Kaiparowits Plateau. *Id.*

33. While European and Euro-American explorers entered the Grand Staircase area as early as 1776, more sustained European and Euro-American settlement occurred when Mormon pioneers entered the area beginning in 1847. *Id.*

34. The settlement in the area by non-Native American settlers caused numerous conflicts with Native Americans, including the Black Hawk War of the 1860s: a conflict between Latter-day Saint settlers, the Ute, Southern Paiute, and other Native Americans, which concluded in 1868 through a peace treaty. *Id.*

35. Conflicts like this contributed to the displacement of Tribal Nations from the Grand Staircase landscape.

36. Despite their physical removal from the area, Tribal Nations maintain deep responsibilities to protect Grand Staircase.

37. Today, Native American people make up a substantial portion of the Grand Staircase region's population. FEIS, vol. 3, app. at I-133.

## II. Contemporary and Historical Importance of Grand Staircase Escalante to the Kaibab Band and the Paiute Indian Tribe of Utah

38. The Kaibab Band's Tribal government headquarters is located approximately 22 miles from Grand Staircase. Kaibab Band Tribal citizens can see the cliffs that give Grand Staircase its name from their reservation boundaries.

39. The Paiute Indian Tribe of Utah's Tribal government headquarters is located approximately 100 miles from Grand Staircase.

40. The Paiute Indian Tribe of Utah is comprised of five bands including the Cedar Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes.

41. The Paiute Indian Tribe of Utah and the Kaibab Band, among other Tribal Nations, are collectively known as the "Southern Paiute."

42. Southern Paiute people have occupied the region in and around Grand Staircase since time immemorial.

43. The Grand Staircase landscape plays a crucial role in Southern Paiute Creation stories.

44. The Southern Paiute believe that Grand Staircase is where their Creator originally placed them and their Creation established a birthright bond between Southern Paiute people and the landscape, including the natural resources within it.

45. The Southern Paiute believe that the natural resources within the Grand Staircase landscape are alive and capable of speaking to Southern Paiute people.

46. The relationship between the Southern Paiute and the Grand Staircase landscape is governed by two principles: first, that all living things are connected in ways that hold the world together; and second, that since their Creation, Southern Paiute people have used and protected the natural resources in accordance with principles of mutual respect and responsibility.

47. Citizens of the Kaibab Band and the Paiute Indian Tribe of Utah utilize the landscape for religious and ceremonial purposes and to connect with and reflect upon their Tribal history.

48. The Kaibab Band and Paiute Indian Tribe of Utah utilize the landscape to educate Tribal citizens and the public about the Tribes' rich history. For example, the Kaibab Band and Paiute Indian Tribe of Utah support youth camps in the Monument. During some of these youth camps, Tribal youth are brought to the Monument to help with the restoration of culturally significant springs. These youth-led restoration projects help teach Tribal youth the historic significance of springs to the Tribes and how to continue to steward the springs for the next generations. Other

youth camps supported by the Kaibab Band and Paiute Indian Tribe of Utah bring Tribal youth and Tribal elders together in the Monument to share and teach about Tribal history and practices connected to the Monument landscape.

49. The Kaibab Band and the Paiute Indian Tribe of Utah have assisted the Bureau of Land Management ("BLM") in the protection of Grand Staircase and its resources since its national monument designation in 1996.

50. For example, in 1996, Southern Paiute Tribal members served as cultural resource monitors to assist BLM in identifying and protecting integral cultural resources within the Monument boundaries.

51. The Kaibab Band and Paiute Indian Tribe of Utah have also expended resources to protect Grand Staircase through their participation as member Tribes of the Grand Staircase Escalante National Monument Inter-Tribal Coalition ("Coalition"). *See generally* Coalition, *Advocating for the long-term protection of the Monument for present and future generations*, https://grandstaircasecoalition.org/ (last visited Nov. 12, 2026).

52. As part of their role as member Tribes of the Coalition, the Kaibab Band and Paiute Indian Tribe of Utah each designated a Tribal member to serve as a representative on the Coalition.

53. The Paiute Indian Tribe of Utah also devoted significant financial and human resources to the development of the 2025 Resource Management Plan for Grand Staircase-Escalante National Monument. BLM, Grand Staircase-Escalante

National Monument Record of Decision and Approved RMP (2025) ("2025 RMP").[1] From 2023 to the present day, the Paiute Indian Tribe of Utah has participated in monthly virtual meetings and quarterly in-person meetings dedicated to Grand Staircase management planning. The Paiute Indian Tribe of Utah devoted numerous hours of their employees' time and thousands in employee expenses alone to participate in Grand Staircase management meetings.

54. The Kaibab Band also devoted significant financial and human resources to the development of the 2025 RMP. From 2023 to the present day, the Kaibab Band has participated in monthly virtual and quarterly in-person meetings dedicated to Grand Staircase management planning. The Kaibab Band devoted numerous hours of their employees' time and employee expenses to participate in Grand Staircase management meetings.

55. The Monument is abundant with cultural resources—for example, just 12,773 acres contain more than 4,600 cultural resources according to findings by the federal government. FEIS, vol. 1 at 3-99.

56. For federal land management purposes, "cultural resources" include archaeological sites, buildings, structures, objects, districts, and locations associated with cultural practices or beliefs of contemporary communities. *Id.*

[1] The BLM document repository, including the Proposed RMP, Approved RMP, FEIS, and Final Scoping Report, associated with Grand Staircase, *are available at* https://eplanning.blm.gov/documents/?id=91d264cd-a7f2-f011-8406-001dd80ef717&spid=8fe7277f-a8f2-f011-8407-001dd80db62a.

57. Historically, the Southern Paiute were comprised of about "a dozen smaller regional units" referred to by Western anthropologists as "districts" but also known as "bands" who occupied specific territories. Richard W. Stoffle et al., *Ethnographic Assessment of Kaibab Paiute Cultural Resources in Grand Staircase-Escalante National Monument[,] Utah* 33 (2004), *available at* https://npshistory.com/publications/blm/grand-staircase-escalante/kaibab-paiute-ea.pdf. These districts served as spheres of influence within the larger geographic region in which they were located. District boundaries were shaped by natural features such as waterways and geologic features. *Id.*

58. Each district contained "nearly all . . . of the resources necessary for the survival of its population." *Id.* For example, districts included water sources, which supported extensive irrigation systems, and forest and desert areas where Southern Paiute people could access a diverse assortment of plants, animals, and other natural resources.

59. Some irrigation systems within districts allowed people to irrigate gardens of maize, beans, and squash. *Id.* at 36.

60. Southern Paiute people relied on game such as deer, mountain sheep, chuckwalla, antelope, and other wild resources like piñon nuts, wild seed grains, agave, sunflowers, Indian rice grass, salt, paint, and quarries used for toolmaking. *Id.* at 33, 36, 38.

61. Districts also included permanent settlements, which allowed people to safeguard claims to certain areas and the resources within as well as territories used exclusively for hunting and gathering. *Id.* at 33.

62. Rivers and geographic features, such as Hurricane Cliffs, served as "social-political" boundaries between districts. *Id.* at 38, 40.

63. While Southern Paiute people generally understood the boundaries of their respective districts, it was common for people living in different districts to travel beyond their local territory to harvest plant and animal resources. When travel into another district was required, such travel was authorized by reciprocal use agreements made with the people living in other districts. *Id.* at 40.

64. Reciprocal use agreements "were negotiated and cemented through" sacred and secular ceremonies. *Id.*

65. As such, many of the Kaibab Band's and the Paiute Indian Tribe of Utah's ancestors routinely traversed the Grand Staircase landscape for political, social, religious, and subsistence reasons as part of an organized and mutually respectful relationship between the Tribal Nations, their peoples, and the land itself.

66. Waters, like rivers and springs, within Grand Staircase have always been central to Southern Paiute livelihood and historically helped shape Southern Paiute sociopolitical structures and belief systems.

67. To Southern Paiute people, water is a living being, it is where certain spirits are found, and it is an important part of Southern Paiute origin stories. Stoffle, *supra*, 77, 80, 84.

68. Control of water resources within the Grand Staircase landscape rested with heads of families, chiefs, or medicine men, and certain families were responsible for stewarding specific water resources, such as springs. *Id.* at 73, 121.

69. Culturally significant rivers within Grand Staircase include the Colorado River, which serves as the eastern boundary of Grand Staircase, the Paria River and the Escalante River, which are tributaries of the Colorado River. *Id.* at 76.

70. To Southern Paiute people, the Colorado River is a place of profound sacredness. Southern Paiute people teach their children the importance of properly speaking to and stewarding the river. Southern Paiute people know the river can give life and health if properly respected. *Id.*

71. Southern Paiute people also believe that proximity to rivers is important. For example, they believe that a medicine plant has greater power if it is growing near the Colorado River. *Id.* at 77.

72. Numerous springs are found throughout the Grand Staircase landscape.

73. More than 75 springs found within Grand Staircase's original boundaries continue to be important to Southern Paiute people today. Stoffle, *supra*, 84.

74. Springs often signaled where Southern Paiute families lived. For Southern Paiute people, the culturally appropriate question asked to figure out where a family is historically from is to ask, "Where is your water?" *Id.* at 77.

75. Southern Paiute families frequently moved between springs based on seasonal subsistence needs and environmental changes. *Id.* at 93.

76. Southern Paiute people's stewardship of these springs also allowed for the domestication and semi-cultivation of plants that grew in or near the springs and used for subsistence, medicine, craft, and ceremonial purposes.

77. Some of these plants included rose, lemonade berry, banana yucca, large prickly pear and piñon pine.

78. Other plants found within Grand Staircase and important to Southern Paiute include willow, sage, juniper, rabbit brush, sego lily, wild potato, prairie spiderwort, small-flowered fishhook cactus, golden mariposa lily, monkey flower, rocky mountain bee plant, cholla, Cronquist's buckwheat, Cutler's spurred lupine, Murdock's evening primrose, smokey mountain globemallow, cliffrose, greasewood, and Ephedra tea.

79. Southern Paiute people still travel to springs in Grand Staircase to visit and collect culturally important plants.

80. Water's significance is also evident by the fact that many rock writing sites, which are places of high importance to Southern Paiute people, are located near water sources. Stoffle, *supra*, 108.

81. Geological formations within Grand Staircase such as the hoodoos at Devil's Garden and arches like Metate Arch, Grosvenor Arch, Cedar Wash Arch, Sunrise Arch, Sunset Arch, and Inchworm Arch are also culturally significant to Southern Paiute people.

82. Southern Paiute people believe that Grand Staircase contains *oodoos*, a Southern Paiute word for places of significant power that are integral pieces of traditional Southern Paiute stories.

83. Southern Paiute people also believe that arches are places of significant power. Certain arches in Grand Staircase are where Southern Paiute people travel to leave offerings and pray.

84. Today, Southern Paiute people continue to affiliate themselves with the places and features in Grand Staircase as symbols of their identity and continue to use the resources within Grand Staircase for cultural, spiritual, and religious practices. Stoffle, *supra*, 42; FEIS, vol. 3, app. at I-58.

85. Even though the Monument encompasses numerous areas required for traditional and modern tribal uses, as well as the resources associated with such uses, many of these areas are known only to Tribal members. FEIS, vol. 1 at 3-111; FEIS, vol. 3, app. at I-57.

86. Further, for some Tribal Nations, "maintaining confidentiality and customs regarding traditional knowledge and important locations can take precedence over identifying and evaluating these resources, resulting in some information being unavailable for inclusion in the NEPA and Section 106 analysis." FEIS, vol. 3, app. at I-58.

### III. Contemporary and Historical Importance of Grand Staircase to the Ute

87. Ute Mountain Ute's Tribal government headquarters is located approximately 230 miles from Grand Staircase.

88. Citizens of Ute Mountain Ute utilize the Monument landscape to connect with and reflect upon their Tribal history.

89. Ute Mountain Ute has also expended resources to protect Grand Staircase through its participation as a member Tribe of the Coalition.

90. As part of its role as a member Tribe of the Coalition, Ute Mountain Ute designated a Tribal member to serve as a representative on the Coalition.

91. Ute Mountain Ute also devoted significant financial and human resources to the development of the 2025 RMP. From 2023 to the present day, Ute Mountain Ute has participated in monthly virtual and quarterly in-person meetings dedicated to Grand Staircase management planning. Ute Mountain Ute devoted numerous hours of their employees' time and employee expenses to participate in Grand Staircase management meetings.

92. The Grand Staircase region has been part of Ute Mountain Ute's ancestral homelands and traditional hunting, gathering, and trading grounds since time immemorial.

93. Ute people's ancestral homelands include all of Colorado, major portions of Utah, northern Arizona and New Mexico, and portions of Wyoming, Kansas, Oklahoma, Nebraska, and Texas.

94. All aspects of life took place on these lands including hunting, fishing, farming, raising livestock, gathering wild plants for food and medicine, firewood gathering, and burial of the dead.

95. Because of these activities, many landforms, canyons, and places within the Grand Staircase landscape are vital features of Ute history.

96. Historically, Ute people organized themselves into bands or groups of families who lived and worked together.

97. Bands occupied specific territories that were recognized by other bands.

98. Ute people traversed their ancestral homelands based on the cycle of the seasons and bands traveled within specific territories to search for food and returned to specific hunting and gathering areas year after year.

99. As such, bands were often named after the geological features of the areas in which they traveled.

100. Bands would also often come together to participate in subsistence activities and religious ceremonies. For example, bands gathered to participate in rabbit drives, antelope and buffalo hunts, and the Bear Dance.

101. Ute people hold deep cultural beliefs that tie them to the land. For example, Ute people believe that the natural world was a gift from their Creator and that it is imbued with spiritual powers.

102. As such, Ute people believe that everything in the natural world received spiritual qualities during Creation: landscapes, rocks, plants, animals, water, and other elements of the natural world have character and interrelated meaning.

103. Ute people believe that water sources are places where spiritual beings reside and activity on or near water sources can affect these beings.

104. The Colorado River and its tributaries, which flow through the Grand Staircase landscape, are culturally significant water resources to Ute people. The Colorado River plays an integral role in Ute oral histories, which in turn, are integral to explaining Ute worldviews.

105. The Colorado River and its tributaries also defined territorial boundaries of different Ute bands.

106. Other water resources, such as watersheds and drainages, served as trail systems and helped Ute people navigate their ancestral lands.

107. Trail systems that traversed Ute ancestral lands often led from one spring to another.

108. Ute people relied on various subsistence resources found within the Grand Staircase region. Culturally significant resources included deer, antelope, buffalo, elk, bear, mountain sheep, trout, catfish, chuckwalla, sage grouse, chokecherry, wild raspberries, pinion pine, sagebrush, juniper, grass seeds, and wild tobacco.

109. Deer played a major role in the Ute economy as Ute migration patterns often paralleled deer migrations.

110. Some of the earliest European contact with Ute people was the 1776 Dominguez-Escalante expedition. The expedition ventured onto Ute lands, followed Ute trails, and was led by Ute guides. Further, journal entries made during the expedition were likely the first written description of Ute lands and Ute people.

111. Colonization displaced the Ute people from the Grand Staircase landscape but did not sever their continued cultural connection to the area.

112. By 1850, conflict between Latter-day Saint settlers and Western Ute bands had begun and by 1870, these conflicts displaced Ute people from their traditional hunting and gathering grounds and decimated the Ute population.

113. However, Ute people actively resisted Latter-day Saint colonization. For example, the Black Hawk War—a series of intensifying raids against Latter-day Saint encroachment into Ute lands—was led by famous Ute war chief, Black Hawk.

114. The Ute people were also directly harmed by land management practices introduced into the Grand Staircase region by Latter-day Saints. For example, the introduction of grazing animals into the landscape led to overgrazing and the decimation of culturally important Ute cultural and natural resources.

115. Therefore, protections of the cultural and natural resources that come with designation of the area as a National Monument are crucially important to Ute people.

## IV. General Historic and Scientific Importance

116. The Clinton and Biden Proclamations described in detail the geological, paleontological, archaeological, historical, cultural, and ecological significance of Grand Staircase and the landmarks and objects to be protected therein. 61 Fed. Reg. at 50223-50225; 86 Fed. Reg. at 57335-57343.

117. Grand Staircase's historic and scientific importance is inextricably linked to the Tribal Nations' presence, stewardship, and knowledge of the landscape and its resources.

118. While often referred to as the "science monument," and lauded for its scientific value, many of Grand Staircase's scientific resources are the same resources that the Tribal Nations use for food, supplies, medicine, shelter, craft, and ceremony, among many other purposes.

119. The Clinton Proclamation and the 2021 Restoration Proclamation found that Grand Staircase's outstanding biological resources include the "richest floristic region in the Intermountain West" that supports a "diverse, rare, and endemic population of plants," animals, and soils. 86 Fed. Reg. at 57335; 61 Fed. Reg. at 50224.

120. As such, Grand Staircase's landscape "contains 50 percent of Utah's rare flora and 125 species of plants that occur only in Utah or the Colorado Plateau." 86 Fed. Reg. at 57337.

121. Some of these rare plants are vital to the Tribal Nations for religious, cultural and traditional purposes.

122. For example, Kaibab Band's and Paiute Indian Tribe of Utah's Tribal citizens travel to the Monument to gather Palmer's penstemon, Indian rice grass, serviceberry, and tobacco, among others, for certain medicines and ceremonies that they cannot gather anywhere else. Stoffle, *supra*, 112, 114-116.

123. Grand Staircase's historic value is similarly predicated on the Tribal Nation's presence, stewardship, and knowledge of the landscape.

124. The Clinton Proclamation and the 2021 Restoration Proclamation found that Grand Staircase holds historic value, in part, because of objects once used by early "pioneers," such as trails, inscriptions, ghost towns, rock houses, and camps. 61 Fed. Reg. at 50224; 86 Fed. Reg. at 57337, 57339.

125. Both Proclamations also tie the Monument's historic importance to the ancestral presence and objects used and created by Native Americans, such as rock art panels, occupation sites, campsites, granaries, pit houses, villages, and storage cysts. 61 Fed. Reg. at 50224; 86 Fed. Reg. at 57338-57339.

126. The Clinton Proclamation, the 2021 Restoration Proclamation, and the 2017 Dismantling Proclamation each highlighted the historic importance of trails within Grand Staircase used by Spanish travelers and Latter-day Saint "pioneers."

127. Trails identified in those Proclamations, such as the Old Spanish Trail and Hole-in-the-rock Road, traverse various parts of the Monument and lead to many of its resources. 86 Fed. Reg. at 57337, 55339; 61 Fed. Reg. at 50224; 82 Fed. Reg. at 58090.

128. In the 1800s, Latter-day Saint settlers were the first European-descendent communities to colonize the Grand Staircase region.

129. With little knowledge of the Grand Staircase landscape, these early settlers relied on the Tribal Nations' unique knowledge of the landscape to help them survive and establish their presence in the region. *See* FEIS, vol. 3, app. at I-59.

130. For example, "the entire length of the Hole-in-the-rock Road led from one significant spring to the next" following "older, long-established Indian trails."

David M. Sabata, *An Analysis of Culturally Significant Plants, Springs, and Archaeology at Grand Staircase-Escalante National Monument[,] Utah* 13 (2018), *available at* https://openknowledge.nau.edu/id/eprint/5477/; *see also* FEIS, vol. 3, app. at I-59.

131. The Old Spanish Trail also consisted of a series of original Indian trails. Tribal Nation guides also often led early Spanish travelers along the trail, helping forge connections and trade between Spanish outposts in Santa Fe and California. Stoffle, *supra*, 44.

132. The presence of non-Native settlers brought negative impacts to the area. For example, travel along these trails and the presence of settlers changed Grand Staircase's physical landscape and detrimentally impacted Southern Paiute people by destroying land, vegetation, animals, and waters that Southern Paiute people depended on. Stoffle, *supra*, 51.

133. A priority of Latter-day Saint colonization was the occupation of traditional Southern Paiute water resources including springs like Pipe Spring and Moccasin Spring. Latter-day Saint occupation of these springs resulted in the loss of water sources and domesticated and semi-cultivated plants, and ultimately the loss of access to their lands and the starvation of many Southern Paiute people by the late 19th Century.

134. Colonization efforts also introduced new land use practices such as sheep and cattle grazing, which negatively impacted the natural vegetation.

135. Overgrazing decimated grasslands and impacted access to subsistence resources like seeds and piñon pine, which are integral to Southern Paiute people's livelihood. Stoffle, *supra*, 67.

136. Early explorers identified in both the Clinton Proclamation and the 2021 Restoration Proclamation, and credited with various scientific achievements, built their reputations on the Tribal Nations' sacred places, sacred objects, and objects of cultural patrimony found within Grand Staircase, while simultaneously destroying those same places and objects.

137. John Wesley Powell became a well-known geologist and anthropologist by documenting aspects of Southern Paiute culture and relying on Southern Paiute guides to help him navigate the Grand Staircase landscape. 61 Fed. Reg. at 50224; 86 Fed. Reg. at 57337.

138. John Wesley Powell also gained notoriety by recommending the forced relocation of Southern Paiute people in 1873 to reservations in Nevada. Powell and others recommended relocation to open additional tracts of lands for Anglo-settlement, agriculture, prospecting, and livestock grazing. Stoffle, *supra*, 69, 70.

139. Both the Clinton Proclamation and the 2021 Restoration Proclamation also describe "world class paleontological sites" and geologic treasures found within Grand Staircase as worthy of protection under the Antiquities Act. 61 Fed. Reg. at 50223.

140. To the Southern Paiute, many of these geological resources, including Vermillion Cliffs, Devil's Garden, Sunrise and Sunset Arches, Grosvenor Arch, and

Metate Arches defined the boundaries of their ancestors' traditional territories, helped orient their ancestors to the landscape, and remain important for Tribal ceremonies today. 61 Fed. Reg. at 50223; 82 Fed. Reg. at 58091, 58092; 86 Fed. Reg. at 57339, 57342-43.

141. Exposed mineral deposits within the Monument allow members of the Tribal Nations to gather clays for medicines and pigments used for ceremonies. Stoffle, *supra*, 79. Clay, copper, quartz, limestone, volcanic rock, and organic fossilized remains are used throughout Southern Paiute cultural activities and ceremonies.

142. Similarly, certain paleontological resources within the Monument are cultural resources used by the Tribal Nations for cultural activities and ceremonies.

143. The Tribal Nations continue to contribute to Grand Staircase's scientific and historic value by assisting the BLM in identifying existing ethnobotanical resources, other scientific resources, and cultural sites within the Monument boundaries.

144. The Tribal Nations know and respect Grand Staircase for its natural and cultural resources in addition to its scientific resources.

## V. The Designation of Grand Staircase Escalante National Monument

145. President Clinton proclaimed Grand Staircase a national monument in 1996, protecting Grand Staircase and its scientific, historic, and cultural resources from the impact of the development of significant coal, oil, and gas reserves found within the boundaries, including the Kaiparowits Plateau. William J. Clinton,

*Remarks Announcing the Establishment of the Grand Staircase-Escalante National Monument at Grand Canyon National Park, Arizona* (Sept. 18, 1996), https://www.presidency.ucsb.edu/documents/remarks-announcing-the-establishment-the-grand-staircase-escalante-national-monument-grand.

146. The Clinton Proclamation describes the geological, paleontological, archaeological, historical, cultural, and ecological significance of Grand Staircase and the landmarks, structures, and objects to be protected. 61 Fed. Reg. at 50223-50225.

147. As indicated in the Proclamation, President Clinton found that certain geological features and paleontological, archeological, and biological sites are unique to Grand Staircase and warranted Antiquities Act protections.

148. The Clinton Proclamation also recognized the ancestral ties that affiliated Tribal Nations have to the Grand Staircase landscape.

149. The Clinton Proclamation specifically recognized the "extensive use of places within the Monument by ancient Native American cultures," that the cultural resources discovered in Grand Staircase "are outstanding in their variety of cultural affiliation, type, and distribution," and that Grand Staircase includes "[h]undreds of record sites…[like] rock art panels, occupation sites, campsites, and granaries" attributable to affiliated Tribal Nations' ancestors. 61 Fed. Reg. at 50224.

150. The Clinton Proclamation also identified biological, geological, and other natural resources that contemporary Tribal Nations use for subsistence, cultural, religious, and traditional purposes.

151. The Clinton Proclamation reserved approximately 1.7 million acres that the President determined was necessary to protect the objects of historic and scientific significance from the imminent threat of coal, oil, and gas development. *Id.* at 50225.

152. When President Clinton designated Grand Staircase, an environmental analysis required to permit a large-scale coal mine in the Kaiparowits Plateau was already underway.

153. The Kaiparowits Plateau coal field is the largest in Utah, containing over 61 billion tons of coal, including—according to a 1997 estimate—a minimum of 11.36 billion tons of coal that is technologically recoverable from the field.

154. Grand Staircase's national monument status effectively ended the proposed mine and any further coal development in the Kaiparowits Plateau.

155. Because of Tribal Nations' inextricable relationship with the Grand Staircase landscape, the Clinton Proclamation protected cultural and natural resources invaluable to the affiliated Tribal Nation's ways of life.

## VI. Congressional Action at Grand Staircase between 1996-2017

156. Since President Clinton established Grand Staircase in 1996, Congress has "adjusted the boundaries or ratified the acquisition of additional lands within the monument on three separate occasions[.]" 86 Fed. Reg. at 57335.

157. Congress first adjusted the Monument's boundaries in 1998 through the Utah Lands Act. Pub. L. No. 105-335, §§ 2-3, 112 Stat. at 3139-41.

158. Through the Utah Lands Act, Congress exchanged approximately 176,000 acres with the State of Utah for lands within and surrounding Grand Staircase.

159. The second time Congress adjusted Grand Staircase's boundaries was through the Automobile Act. Pub. L. No. 105-355, § 110, 112 Stat. at 3247, 3252-53.

160. Through the Automobile Act, Congress modified Grand Staircase's boundaries by excluding and including certain land parcels.

161. Finally, in 2009, through the Omnibus Public Land Management Act, Congress codified the 1996 Grand Staircase boundaries ("Omnibus Act").

162. When Congress was done, it had increased Grand Staircase's land base by over 180,000 acres, bringing the total monument lands to approximately 1.87 million acres. 86 Fed. Reg. at 57344.

## VII. President Trump's First Attempt to Revoke Grand Staircase Escalante as a National Monument and Replace it with Different Monuments

163. On December 4, 2017, President Trump issued Proclamation 9682, which attempted to undeclare Grand Staircase Escalante National Monument. 2017 Dismantling Proclamation, 82 Fed. Reg. 58089 (Dec. 8, 2017).

164. The 2017 Dismantling Proclamation slashed Grand Staircase's acreage by 860,000 acres and created three distinct units called the Grand Staircase unit, the Kaiparowits unit, and the Escalante Canyons unit. 82 Fed. Reg. at 58093.

165. The 2017 Dismantling Proclamation directed BLM to develop a new resource management plan for the management of each of the three units. 82 Fed. Reg. at 58094

166. On December 4, 2017, thirteen non-profit conservation organizations and private organizations filed a lawsuit challenging President Trump's authority to undeclare previously established national monuments under the United States Constitution, the Antiquities Act, and the Administrative Procedure Act.

167. In 2020, BLM developed four distinct resource management plans: one for the management of each of the three monument units, and one for the management of the 860,000 excised acres. 82 Fed. Reg. at 58094.

168. The 2020 Resource Management Plans for the Grand Staircase-Escalante National Monument and Resource Management Plan for the Kanab-Escalante Planning Area (collectively "2020 RMP")[2] were developed without input from Tribal Nations affiliated with the Monument, including the Plaintiffs.

169. The management plan for the 860,000 excised acres set forth directives consistent with the "multiple use, sustained yield" principles of the Federal Land and Policy Management Act of 1976 ("FLPMA"), which requires BLM to manage lands not designated for specific uses, in a manner that allows oil and gas drilling, mining,

[2] The BLM document repository for 2020 planning, including the FEIS and Final Scoping Report, associated with Grand Staircase, *are available at* https://eplanning.blm.gov/documents/?id=6ea39ba0-a7f2-f011-8407-001dd803d067&spid=65906569-a8f2-f011-8407-001dd80bcf93.

off-highway vehicle use, and wilderness protection, among other uses. *See* 43 U.S.C. §1702(c), §1712, §1732(a).

## VIII. President Biden Redeclares Grand Staircase Escalante

170. On January 20, 2021, President Biden ordered the Secretary of the Interior to conduct a review of Grand Staircase's boundaries, in consultation with Tribal governments among others, to determine whether restoration of its boundaries and conditions that existed as of January 20, 2017, would be appropriate. Exec. Ord. 13990, Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, 86 Fed. Reg. 7037, 7039 (Jan. 25, 2021).

171. In the following months, DOI officials held consultations with Tribal representatives to discuss the Monument. And, in April 2021, the Secretary of the Interior Deb Haaland met with Tribal Nations, including the Plaintiffs, to discuss Grand Staircase and its boundaries. DOI, Press Release, Secretary Haaland Wraps Three-Day Visit to Utah (Apr. 9, 2021), https://www.doi.gov/news/secretary-haaland-wraps-three-day-visit-utah.

172. In June 2021, Secretary Haaland recommended that President Biden restore the Monument to its pre 2017 Dismantling Proclamation boundaries. *See* The Wilderness Society, *Report: Sec Haaland recommends restoring Bears Ears* (June 14, 2021), https://www.wilderness.org/articles/blog/report-sec-haaland-recommends-restoring-bears-ears.

173. On October 8, 2021, President Biden redeclared Grand Staircase Escalante National Monument. Proc. No. 10286, Grand Staircase-Escalante National Monument, 86 Fed. Reg. at 57335.

174. The 2021 Restoration Proclamation directs that the Monument be restored "to its size and boundaries as they existed prior to December 4, 2017," thereby restoring protections to objects of historic and scientific interest identified by the original Clinton Proclamation.

175. The 2021 Restoration Proclamation states that "in the absence of a reservation under the Antiquities Act, the objects identified in this proclamation and in [the Clinton Proclamation] are not adequately protected" by the boundaries established in the 2017 Dismantling Proclamation. 86 Fed. Reg. at 57335, 57344.

176. The 2021 Restoration Proclamation further directs that the Monument shall be managed as part of the National Landscape Conservation System, which was established "to conserve, protect, and restore nationally significant landscapes that have outstanding cultural, ecological, and scientific values for the benefit of current and future generations." 16 U.S.C. § 7202.

177. BLM is therefore required to manage the Monument "in a manner that protects the values for which the components of the system were designated." 16 U.S.C. § 7202; *see also* FEIS, vol. 1 at 1-1.

178. The 2021 Restoration Proclamation expands on the Clinton Proclamation's recognition that Tribal Nations maintain enduring relationships,

traditional uses, religious connections, and ongoing stewardship interests in the Monument.

179. It also identifies that the Grand Staircase landscape itself contains a multitude of objects subject to protection under the Antiquities Act—that the Monument is "akin to a nesting doll of objects of historic and scientific interest." 86 Fed. Reg. at 57336-57338.

180. The Proclamation recognizes such objects of historic or scientific interest as "sacred to Tribal Nations, rare, fragile, or vulnerable to vandalism and theft, or are dangerous to visit and, therefore, revealing their specific names and locations could pose a danger to the objects or the public." 86 Fed. Reg. at 57336.

181. The 2021 Restoration Proclamation recognizes that Tribal Nations, including the Plaintiffs, "have ancestral, cultural, or historical ties to this area and continue to use the area to this day." *Id.*

182. It further provides that "[t]he Southern Paiute people in particular hold these lands sacred as they make up a portion of their traditional homeland." 86 Fed. Reg. at 57337.

183. The 2021 Restoration Proclamation directs the Secretary of the Interior to consult with Tribal Nations in the development of a new management plan for the Monument. 86 Fed. Reg. at 57345.

184. Tribal representatives applauded this express recognition, which had only previously been implied in the Clinton Proclamation. UC Santa Barbara, *What They Are Saying: Leaders Across the Country Applaud President Biden's Restoration*

*of Protections for Three National Monuments*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/what-they-are-saying-leaders-across-the-country-applaud-president-bidens-restoration (last visited Nov. 12, 2026).

## IX. Implementation of the 2021 Restoration Proclamation

185. President Biden directed BLM to prepare a new management plan for the Monument with the specific purpose of "protecting and restoring the objects identified in [the 2021 Restoration Proclamation] and in [the Clinton Proclamation]." 86 Fed. Reg. at 57345.

186. As directed by the 2021 Restoration Proclamation, BLM began the planning process in July 2022.

187. The management plan's purpose is "to guide monument management, consistent with the protection of GSENM objects and the management direction provided in Proclamations 10286 and 9620." BLM, Final Scoping Report at I-2 (Dec. 2022) ("Scoping Report").

188. During the scoping process, Plaintiffs and other Tribal Nations participated in planning discussions related to cultural landscapes, Tribal access to and protection of cultural resources, and management priorities within the Monument. *See generally* Scoping Report.

189. The intensive engagement and participation of Tribal Nations is evidenced by the 2025 RMP.

190. Rather than treating important sites as isolated locations, Tribal Nations emphasized the Monument's interconnected cultural landscape, traditional

uses, and ongoing cultural and religious connections, all of which have persisted since time immemorial. *See* FEIS, vol. 3, app. at I-59 ("It is important to note that the above locations and uses do not exist in isolation; it is the interconnection of various resources within a defined area that make the locations and uses of continuing interest and importance to tribal communities.").

191. The Tribal Nations' perspective influenced management discussions regarding cultural resource protection, travel management, visitor use, interpretation, and implementation planning. *See* FEIS, vol. 1 at 2-15.

192. Moreover, the 2025 RMP directs BLM to prepare an implementation-level cultural resource management plan, and expressly requires that BLM develop that plan in consultation and collaboration with the Plaintiffs.

193. The 2025 RMP further requires Agency Defendants to consult and collaborate with Tribal Nations regarding Monument management activities. This includes sending quarterly reports and hosting semiannual meetings with Tribal Nations, among other management directives. *See, e.g.*, 2025 RMP at 2-74 – 2-75.

194. The involvement of Tribal Nations in site-specific management decisions is a procedural mechanism that implements the 2021 Restoration Proclamation's directive that Tribal Nations's historic, cultural, and religious places, resources, and wellbeing be adequately protected.

## X. The Formation of the Grand Staircase Escalante Inter-Tribal Coalition

195. In 2024, the Plaintiffs, the Hopi Tribe, the Navajo Nation and the Zuni Tribe formed the Grand Staircase Escalante National Monument Inter-Tribal Coalition (the "Coalition").

196. The Coalition participated in developing a draft co-stewardship agreement with the local BLM field office responsible for managing the Monument. The draft agreement outlined collaborative processes and procedures for ensuring that Tribal management priorities and interests are considered in the management of the Monument. FEIS, vol. 1 at 4-4.

197. As part of the Tribal Nations' engagement in the federal land management planning process, the Tribal Nations joined BLM and other supporting organizations on field visits to various locations across the Monument to "review spring sites and rock writing locations, [and] discuss overall management challenges." *Id.* During these visits the Tribal Nations shared Tribal knowledge about Grand Staircase's dark skies and traditional views of specific places in the Monument. *Id.*

198. The Coalition's goals include advocating for the conservation of the affiliated Tribal Nations' ancestral lands, the continued protection and preservation of the cultural and environmental resources found within Grand Staircase, including protection from looting, vandalism, and graffiti, and the defense of Grand Staircase from any attempts to modify its boundaries or reduce its protections.

199. The Coalition also formed with the aim to protect Grand Staircase for all Americans to appreciate and enjoy.

200. Since its formation, the Coalition has met on multiple occasions to address ongoing threats to Grand Staircase, including an attempt to invalidate the 2025 RMP through the Congressional Review Act ("CRA") (discussed below) and the impact of the 2026 Dismantling Proclamation.

201. Prior to these threats, the Coalition dedicated much of its time to implementing the protections outlined in the 2025 RMP and developing co-stewardship projects within Grand Staircase consistent with the 2025 RMP.

202. Threats to Grand Staircase, such as the CRA and the 2026 Dismantling Proclamation, forced the Tribal Nations to divert resources from developing projects that strengthen protections for their sacred places and cultural and natural resources through their Coalition work to defending Grand Staircase's boundaries.

## XI. The 2025 Resource Management Plan

203. On January 6, 2025, the BLM approved the 2025 RMP and issued a final Record of Decision. 90 Fed. Reg. 2741 (Jan. 13, 2025).

204. Before the 2025 RMP's approval, the Tribal Nations participated in BLM-facilitated government-to-government meetings in June 2023, January 2024, and March 2024. During these meetings, the Tribal Nations provided input on their review of the draft Grand Staircase Environmental Impact Statement and suggestions for the 2025 RMP.

205. The 2025 RMP marked the first time the BLM consulted with affiliated Tribal Nations during the development of a resource management plan for Grand Staircase.

206. The 2025 RMP was also the first Grand Staircase resource management plan that included Tribal priorities and perspectives on how to best manage and protect the integrity of cultural resources, sacred places, traditional cultural landscapes, plants, wildlife, paleontological resources, and other resources important to the Tribal Nations' lifeways.

207. The 2025 RMP outlines directives to protect the Tribal Nations' sacred places and resources in several ways. Relevant directives include:

a. Providing Tribal Nations with access to important resources for proper stewardship and management as well as the ability to collect resources necessary for cultural, religious, and traditional practices.

b. Requiring the development of a cultural resource management plan that provides site and resource specific management directives.

c. Requiring BLM to engage Tribal Nations in working toward the development of co-stewardship plans regarding the management of importance resources.

d. Requiring BLM to avoid, reduce, and/or remove imminent and long-term threats to resources important to Tribal Nations.

e. Requiring BLM to incorporate Tribal Nations' Indigenous Knowledge into directives related to scientific research, interpretation and public education about Monument objects and resources, and the management of objects and resources.

f. Requiring BLM to designate lands as available or unavailable for livestock grazing to protect Tribal Nations' resources from desecration.

g. Requiring BLM to designate lands as limited to off-road vehicle use to protect Tribal Nations' resources from desecration.

h. Designating Areas of Critical Environmental Concern to ensure increased protection for areas where special management attention is necessary.

i. Classifying Tribal Nations' cultural resources under specific use categories to ensure appropriate levels of protection for resources depending on their level of sensitivity or vulnerability.

208. In addition to providing detailed protections for Tribal Nations' sacred places and cultural resources, the 2025 RMP ensures that the Tribal Nations' historical and contemporary connections to Grand Staircase are preserved for the education of the American public.

209. In conjunction with the development of the 2025 RMP, the Tribal Nations also participated in the development of the 2025 Grand Staircase-Escalante National Monument Science Plan ("2025 Science Plan") designed to support and foster scientific research within Grand Staircase.

210. The 2025 Science Plan requires the incorporation of Tribal Nations' ethnobotanical knowledge in assessing, protecting, and restoring cultural resources within Grand Staircase, especially riparian vegetation.

## XII. The Implementation of the 2025 Resource Management Plan

211. After the publication of the 2025 RMP, the Tribal Nations continued to work collaboratively with the BLM to manage and protect their sacred places and the cultural and natural resources within Grand Staircase.

212. The Tribal Nations have met bi-annually with BLM representatives to discuss how they can continue to actively participate in Grand Staircase's management.

213. Meetings between the Tribal Nations and the BLM included updates about any threats, impact, or damage to Tribal Nations' scared places or resources and conversations about how to better protect these places through monitoring, signage, fencing, closure, or other methods.

214. These meetings have also included discussions about how to incorporate Tribal Nations' Traditional Ecological Knowledge into site management, updates about future projects, and discussions about site stewardship programs where Tribal members and Tribal youth can assist BLM on projects within Grand Staircase, such as projects to help restore a stream that has been degraded by human impacts.

215. The Tribal Nations have also attended specific government-to-government consultation meetings with representatives of DOI, Bureau of Indian Affairs, and BLM, dedicated to the development of a co-stewardship agreement for Grand Staircase.

216. The Tribal Nations expended resources to travel to, participate in, and share valuable Traditional Ecological Knowledge in meetings related to the co-stewardship agreement.

## XIII. Congress's Rejection of the Attempt to Invalidate Protections for Grand Staircase Through the Congressional Review Act

217. In July 2025, Utah Representative Celeste Maloy requested an opinion from the United States Government Accountability Office ("GAO") to determine whether the 2025 RMP was a "rule" under the CRA.

218. Under the CRA, before a rule can take effect, a federal agency must submit the rule to the House of Representatives, the Senate, and the Comptroller General.

219. The CRA allows Congress, by simple majority vote in both chambers, to reject a federal agency rule within 60 legislative session days after the rule is formally reported to Congress.

220. If Congress rejects the federal agency rule, the federal agency is barred from issuing another rule that is "substantially the same" in the future.

221. In January 2026, the GAO found that the 2025 RMP was a rule under the CRA.

222. In March 2026, Senator Mike Lee and Representative Maloy introduced Joint Resolutions of Disapproval under the CRA in attempt to invalidate the 2025 RMP.

223. The Utah Congressional delegation sought to use the CRA to invalidate the 2025 RMP and reinstate the 2020 RMP.

224. The reinstatement of the 2020 RMP would have reduced protections for cultural and natural resources within Grand Staircase.

225. The 2020 RMP was prepared without input from the Monument-affiliated Tribal Nations and would have allowed for increased off-highway vehicle

use, hunting, grazing, mining and oil and gas drilling within the Grand Staircase boundaries.

226. Congress did not pass the Joint Resolutions of Disapproval and, as a result, the 2025 RMP remains in place.

## XIV. President Trump's Second Attempt to Undeclare Grand Staircase

227. President Trump signaled his intent to attack Grand Staircase in early 2025. On January 20, 2025, President Trump issued Executive Order 14154 titled "Unleashing American Energy."

228. Executive Order 14154 directed the heads of all agencies to review all agency actions "that impose an undue burden on the identification, development, or use of domestic energy resources–with particular attention to oil, natural gas, coal…[and] critical mineral[s]."

229. On February 3, 2025, Defendant Burgum issued Secretarial Order 3418 implementing Executive Order 14154 and calling for a direct review of recent monument designations including Grand Staircase.

230. Despite Congress's decision not to strip protections for Grand Staircase through the CRA, President Trump targeted Grand Staircase through a second presidential proclamation.

231. On July 13, 2026, President Trump issued Proclamation No. 11044 titled "Modifying the Grand Staircase-Escalante National Monument." 91 Fed. Reg. 45179 (July 17, 2026).

232. The federal government did not consult the Tribal Nations prior to the issuance of the 2026 Dismantling Proclamation, but previously assured Tribal Nations that national monuments would not be targeted for revocation.

233. The 2026 Dismantling Proclamation attempts to reduce Grand Staircase's acreage from 1.9 million acres to 181,541 acres, purportedly undeclaring 90% of Grand Staircase's original boundaries.

234. This reduction results in the creation of two smaller units, as pictured below: the 172,641-acre Canyons of the Escalante Horizon Unit and the 8,900-acre Kaiparowits Horizon Unit. 91 Fed. Reg. at 45181.

235. The two additional units pictured in the bottom part of the map are part of the Kaiparowits Horizon Unit and are lands Congress added to Grand Staircase through the 1998 Automobile Act.



236. The reduction revokes monument status for nearly 160,000 acres of land added to the Monument by Congress since 1996.

237. The 2026 Dismantling Proclamation rests its reasoning on false claims that the Antiquities Act "permits the President to remove land from the monument and return it to its prior federally managed status" when "the President determines that the structures and objects identified by a prior monument proclamation no longer are, or never were, deserving of the Antiquities Act's protections," despite no such language appearing anywhere in the text of the Act. 91 Fed. Reg. at 45181.

238. Upon issuance, the 2026 Dismantling Proclamation opened the 1.7 million acres of excised lands to grazing, motorized and non-motorized vehicle use, and weed management by mechanical, natural, or chemical use. On September 11, the 2026 Dismantling Proclamation opened the excised lands to location, entry, and patent under mining laws.

## XV. The 2026 Dismantling Proclamation Causes Particular Harms to the Tribal Nations

239. The 2026 Dismantling Proclamation irreparably harms and impacts each of the Tribal Nation's relationship to Grand Staircase's landscape and its cultural and natural resources.

240. President Trump's illegal revocation of the Monument, without consultation, injures each of the Tribal Nations' sovereign interests by subjecting their ancestral lands, cultural resources, ancestral hunting and gathering sites, natural resources, and sacred places to irreparable harm and damage.

241. The purported revocation of Grand Staircase has harmed specific, identifiable Tribal members who use and rely upon lands and resources within the Monument for cultural, spiritual, religious, subsistence, and other purposes essential to their ways of life.

242. Each Tribal Nation has citizens who visit Grand Staircase, including in the areas purportedly excised from the Monument by the 2026 Dismantling Proclamation, to: (1) conduct ceremonies; (2) hunt, fish or, gather; (3) care for cultural resources; (4) pray; (5) visit their ancestors; or (6) teach young Tribal members about their own past and present.

243. The 2026 Dismantling Proclamation harms the Tribal Nations by opening lands near their communities to the development of mineral resources such as coal, oil, gas, and other critical minerals. Extractive techniques required to access these resources threaten irreparable damage to the water, air, environment, and health of the Tribal Nations' citizens.

244. The 2026 Dismantling Proclamation violates the laws of the Paiute Indian Tribe of Utah, which require the Tribe to protect against harm done to natural and cultural resources, including, but not limited to, Tribal Resolution No. 97-30, which affirms the Paiute Indian Tribe of Utah's "constitutional resolve to protect the cultural and natural resource interests of the tribe."

245. The 2026 Dismantling Proclamation obstructs the Ute Mountain Ute Tribal Council's obligation to protect and promote "the natural, cultural, traditional and archaeological resources of the Tribe and the health and welfare of its members.

246. The 2026 Dismantling Proclamation purportedly revoked monument status and protections for approximately 1.7 million acres and ostensibly opened the excised lands to oil and gas exploration and development, hard-rock mineral location, underregulated OHV use, vandalism and looting, and reckless recreation, all of which threaten the Tribal Nations' cultural, religious, and traditional resources and practices.

247. In particular, the 2026 Dismantling Proclamation purportedly excised all but 8,900 acres of the Kaiparowits Plateau from Grand Staircase's boundaries.

248. To the Southern Paiute, the Kaiparowits Plateau is an area of profound importance.

249. Stretching approximately 1,650 square miles, the Kaiparowits Plateau contains large areas where Southern Paiute people's ancestors are buried.

250. Southern Paiute people believe that their ancestors' spirits prefer to remain buried where they were originally placed. If spirits are disturbed or moved, this can cause harm to the living like the collapse of dams and drowning.

251. Extractive resource development has always threatened the Kaiparowits Plateau. Beginning in the late 1800s, small scale coal mining in the Kaiparowits Plateau displaced Tribal Nations from the landscape.

252. By the 1980s, a foreign-owned mining company began formulating plans to mine underground and ship up to 2.5 million tons of coal annually from their leasehold in the southern part of the Kaiparowits Plateau coal field.

253. A 2018 report, commissioned after the 2017 Dismantling Proclamation, estimated that up to 9 billion tons of coal is potentially recoverable from the Kaiparowits Plateau coalfield and rated the area high for development potential. BLM, Mineral Potential Report, at 4 and 5, https://npshistory.com/publications/blm/grand-staircase-escalante/mineral-potential-2018.pdf ("Mineral Potential Report").

254. The Mineral Potential Report also rated the occurrence potential for uranium, vanadium, copper, titanium, zirconium, manganese, and gypsum as high in certain areas of the Monument. *Id.*

255. The threat of increased mining activity in the rest of Monument's excised lands is real. Activities after the 2017 Dismantling Proclamation prove that stripping monument protections leads to harmful industrial activity. Due to the accelerated and minimal process to establish mining claims, 12 new mining claims were staked in the lands that the 2017 Dismantling Proclamation excluded from the Monument – claims that would have been prohibited had protections established by the Clinton Proclamation remained in place.

256. The 2026 Dismantling Proclamation not only opened the excised lands in the Kaiparowits Plateau and elsewhere in the pre-2026 Dismantling Proclamation boundaries to drilling, but also to the mining of critical minerals including chromium, cobalt, copper, iron, lead, manganese, molybdenum, nickel, silver, thorium, titanium, uranium, vanadium, zinc, and zirconium. 91 Fed. Reg. at 45180.

257. Since September 11, 2026, these excised lands have been open to

location, entry, and patent under mining laws without the protections of the Clinton Proclamation and 2021 Restoration Proclamation. As a result, nothing now stands between a claimant and the ground. Under the General Mining Act of 1872, a prospector needs no permit or other prior authorization from BLM or any other agency to locate a claim and enter the land. A claimant may undertake "casual use" activities without any prior approval and "notice-level" activities—defined as "causing surface disturbance" on up to five acres—simply by sending BLM notice of its plans. 43 C.F.R. §§ 3809.10(a)–(b), 3809.21(a), 3809.312(a), 3809.605(b). The resumption of even these activities disturbs surface soils and can destroy objects that are hundreds or thousands of years old and in fragile condition.

258. Notice-level activities also cause visual, auditory, olfactory, and other sensory effects that diminish enjoyment and use of the Monument and disrupt and preclude Tribal practices that require tranquil and undisturbed environments.

259. Since the issuance of the 2026 Dismantling Proclamation, 41 new mining claims have reportedly been staked in Grand Staircase – including 13 in the newly reduced Monument boundaries, six that may be within the newly reduced Monument boundaries, and 22 in the recently excised lands. National Parks Conservation Assoc., *Over 40 Mining Claims Filed in Grand Staircase-Escalante National Monument[,] including at least 13 within shrunken boundaries*, Press Release (Oct. 28, 2026) https://www.npca.org/articles/11540-over-40-mining-claims-filed-in-grand-staircase-escalante-national-monument. While some of these claims

may be invalid, that claims continue to be staked demonstrates the high likelihood that additional mining claims will be staked within the recently excised lands.

260. The staked claims sit in areas that threaten the Tribal Nations' cultural and spiritual patrimony and practices, subsistence gathering, and other traditional and contemporary uses. The 2026 Dismantling Proclamation threatens the same harms across roughly 90% of the lands the 2021 Restoration Proclamation protected.

261. Further, the 2026 Dismantling Proclamation excluded culturally significant areas from monument protections. Areas excluded include Devil's Garden, Metate Arch, Grosvenor Arch, the Nautilus, Cedar Wash Arch, Sunrise Arch, Sunset Arch, Inchworm Arch, Watson Canyon, and the Lampstand.

262. Some of these culturally significant areas like Devil's Garden and Grosvenor Arch were areas that the 2017 Dismantling Proclamation deemed worthy of protection under the Antiquities Act. 82 Fed. Reg. at 58092.

263. The 2026 Dismantling Proclamation not only attempts to slash the size of Grand Staircase but also attempts to shrink Tribal Nations presence and cultural and religious ties to the Monument.

264. While the Tribal Nations are the original stewards of the Grand Staircase landscape and there is an extensive federal record of their continued presence and use of the area, the Tribal Nations' contemporary connections to the Monument are not mentioned in the 2026 Dismantling Proclamation.

265. Rather than depict the Tribal Nations' connections to the Monument as active and enduring, the 2026 Dismantling Proclamation relegates their connections to the Monument as a relic of the past.

266. Their exclusion from 2026 Dismantling Proclamation prevents the Tribal Nations from telling an accurate narrative of their historic and contemporary relationship to Grand Staircase.

267. The 2026 Dismantling Proclamation also claims that "certain landmarks, structures, or objects" identified in the 2021 Restoration Proclamation "are not unique" to Grand Staircase and are thus "not of *particular* historic or scientific interest" and do not warrant protection under the Antiquities Act. 91 Fed. Reg. at 45180.

268. Although looting of cultural resources sites within the 2021 Monument boundaries has been "rare," looting and vandalism, including graffiti of petroglyph panels, casual collection of artifacts and historic objects have been a problem within the Monument. FEIS, vol. 3, app. at I-55.

269. For example, in December 2025, archaeologists were alerted by a person concerned about a Facebook post photo depicting a person posing with human remains in Kanab, Utah. Carter Williams, $3K reward offered as Utah investigates theft of human skull at ancient burial site, KSL News (Dec. 8, 2025) https://www.ksl.com/article/51416184/3k-reward-offered-as-utah-investigates-theft-of-human-skull-at-ancient-burial-site.

270. BLM has previously engaged in public education efforts to address looting and vandalism. FEIS, vol. 3, app. at I-55, I-56.

271. As a result, "observations suggest that looting has tapered off in recent years largely due to public education and law enforcement efforts." *Id.* at I-56.

272. The reduction of the Monument will undo the federal government's worthwhile public education and law enforcement efforts that ensured significant cultural resources and other objects of historic and scientific importance remained protected.

273. Likewise, grazing-related impacts to cultural resources within the Monument have substantially reduced over the years leading up to a 2016 study. However, the adjacent BLM-managed grazing allotments in Glen Canyon have caused significant grazing damage to cultural resources, including impacts from animal trampling, artifact breakage, livestock rubbing against structures and petroglyphs, and cattle trails causing increased erosion.

274. Additionally, any livestock infrastructure, such as fencing and water troughs, create even greater impacts on cultural resources when sited within or near cultural resources. FEIS, vol. 1 at 3-102.

275. BLM has previously determined that areas absent the level of grazing restrictions consistent with the Monument designation (i.e., the Kanab-Escalante Planning Area ("KEPA")), could see increased grazing-related impacts on cultural resources if the reduced grazing restrictions were to remain. FEIS, vol. 3, app. at I-56.

276. Therefore, the abundant Tribally significant cultural resources in areas no longer managed within the Monument will be at risk of similarly significant grazing damage. FEIS, vol. 3, app. at I-56 (2025).

277. Increased grazing activity will also detrimentally impact culturally significant springs. The aquifers that feed the springs at Grand Staircase are at a greater risk of depletion because increased grazing requires extracting ground water from these aquifers to provide water for stock animals.

278. Further, the 2026 Dismantling Proclamation undermines the Fiftymile Mountain Research Natural Area, which is set forth under the 2025 RMP as an Area of Critical Environmental Concern ("Fiftymile Mountain ACEC") to provide specific protections to its cultural, scientific, and water resources. At a minimum, the 2026 Dismantling Proclamation diminishes the protection of those resources, which BLM found required special management protection, but it could also eliminate the Fiftymile Mountain ACEC altogether.

279. The Fiftymile Mountain ACEC contains a high density of inventoried archeological sites that are considered fragile, sensitive, and irreplaceable resources that are threatened and vulnerable.

280. The 2025 RMP ensures protections for the cultural resources within the ACEC by requiring a permit for camping, right-of-way exclusion, and the development of a cultural resource monitoring plan to manage the appropriate level of grazing, including no grazing.

281. The 2026 Dismantling Proclamation attempts to exclude the entirety of the Fiftymile Mountain ACEC from Grand Staircase's boundaries.

282. Specifically, the Fiftymile Mountain ACEC consists of 54,800 acres and includes "unusual density of water resources and significant cultural values, including a cultural crossroads of the Fremont and Ancestral Pueblo cultural groups, with sites spanning multiple time periods." FEIS, vol. 3, app. at H-54.

283. Springs are culturally and historically significant to the Tribal Nations and are found throughout the Monument. For instance, particular areas of the Kaiparowits Plateau, including the Fiftymile Mountain ACEC, are significant because of their high density of springs. FEIS, vol. 3, app. at H-57.

284. Under FLPMA, ACECs require "special management attention . . . to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards." 43 U.S.C. § 1702(a).

285. In fulfilling this statutory directive, the BLM's approved 2025 RMP includes management direction for the Fiftymile Mountain ACEC that requires the agency to develop a cultural resources monitoring plan, coordinate with grazing permittees to identify potential impacts from livestock grazing, and to determine the appropriate level of grazing—including no grazing for the protection of cultural resources in the applicable allotment management plans. FEIS, vol. 1 at 3-264 (Table 3-71).

286. The 2025 RMP directs BLM to collaborate with Tribal Nations to develop a co-stewardship plan and consult with interested Tribal Nations, among other responsibilities. *See* 2025 RMP at 2-72 – 2-75.

287. The unlawful 2026 Dismantling Proclamation, if left in place, impairs the above efforts of interested Tribal Nations—specifically, the Plaintiffs, from ensuring that BLM fulfills its responsibilities outlined in the 2025 RMP, Joint Secretarial Order No. 3403, BLM Instruction Memorandum 2022-11, among others.

## CLAIMS

## FIRST CLAIM FOR RELIEF

### Antiquities Act, 54 U.S.C. § 320301 (All Defendants)

288. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 287.

289. The U.S. Constitution gives Congress the "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2.

290. The U.S. Constitution does not vest the President or the Executive Branch with any authority over federal land.

291. The President and the Executive Branch may therefore only exercise authority over federal land to the extent delegated by Congress.

292. Congress delegated limited powers over federal lands to the President in the Antiquities Act. President Trump exceeded his delegated authority in the Antiquities Act when purporting to undeclare Grand Staircase as a national monument. 54 U.S.C. § 320301.

293. The Antiquities Act empowers the President only to declare national monuments. 54 U.S.C. § 320301(a). It does not delegate power or authorize the President to undeclare or revoke them once designated.

294. The Antiquities Act empowers the President only to reserve lands as part of monuments. It does not delegate the power to unreserve those lands. *Id.* at 320301(b).

295. In issuing his 2026 Dismantling Proclamation, President Trump acted in contravention of the authority delegated to the President under the Antiquities Act. 54 U.S.C. § 320301. That action purported to revoke the lawful establishment of Grand Staircase Escalante National Monument and to replace it with two different, much smaller ones, and thereby reduced the public lands reserved as part of the Monument. It also purported to remove monument protections for tens of thousands of objects identified in 1.7 million acres of the Grand Staircase Escalante National Monument.

296. The 2026 Dismantling Proclamation also violates Congressional action regarding Grand Staircase's boundaries. Utah Lands Act, Pub. L. No. 105-335, 112 Stat. 3139 (1998); Automobile Act, Pub. L. No. 105-355, 112 Stat. 3247 (1998); Omnibus Act, Pub. L. No. 111-11, 123 Stat. 991 (2009).

297. As a result, the 2026 Dismantling Proclamation's revocation of the Monument is ultra vires executive action subject to non-statutory review. The steps Agency Defendants have taken and will take to implement the 2026 Dismantling

Proclamation's revocation of the Monument are likewise ultra vires executive action subject to non-statutory review.

**SECOND CLAIM FOR RELIEF**

**U.S. Constitution, Article IV, Section 3, Clause 2 and Article I, Sections 1 and 7 — Separation of Powers (All Defendants)**

298. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 287.

299. The Constitution gives Congress the power over federal lands. The Property Clause provides that "[t]he Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. The Constitution likewise gives the lawmaking power to Congress alone. "All legislative Powers herein granted shall be vested in a Congress of the United States," U.S. Const. art. I, § 1, and a bill becomes law only after it passes both Houses and is "presented to the President of the United States," *id.* art. I, § 7, cl. 2.

300. The President has no inherent constitutional authority over federal lands. He may reserve federal lands, dispose of them, or make rules for them only to the extent Congress has delegated that power to him by statute.

301. In the Antiquities Act, Congress delegated to the President the power to declare national monuments and to reserve federal lands as part of them. 54 U.S.C. § 320301. Congress did not delegate the power to revoke a national monument, or to shrink the land reserved for it, once the monument is created. That power remains with Congress.

302. Congress has demonstrated its exclusive power to amend national monuments with respect to Grand Staircases' boundaries through several legislative actions. Utah Lands Act, Pub. L. No. 105-335, 112 Stat. 3139 (1998); Automobile Act, Pub. L. No. 105-355, 112 Stat. 3247 (1998); Omnibus Act, Pub. L. No. 111-11, 123 Stat. 991 (2009).

303. No statute authorizes the 2026 Dismantling Proclamation. It purports to remove more than 1.7 million acres from Grand Staircase Escalante National Monument. It also purports to open those lands to uses the Monument's reservation forbade, including location and entry under the mining laws. In issuing it, the President unlawfully usurped Congress's power under the Property Clause to dispose of federal property and to make the rules that govern it.

304. Because the 2026 Dismantling Proclamation rests on no lawful authority, the Agency Defendants have no authority to implement it. Their actions to carry out its purported revocation of the Monument, including treating the excised lands as open to location and entry under the mining laws, are thus likewise beyond constitutional authority and violate the separation of powers.

**THIRD CLAIM FOR RELIEF – MONUMENT REVOCATION**

**Administrative Procedure Act, 5 U.S.C. § 551 et seq. (All Agency Defendants)**

305. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 287.

306. The APA provides a cause of action to any person "adversely affected or aggrieved by agency action," 5 U.S.C. § 702, and makes final agency action reviewable,

*id.* § 704. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." *Id.* § 706(2)(A), (C).

307. President Trump had no lawful authority to revoke the Monument or shrink its boundaries. The 2021 Restoration Proclamation therefore remains in effect, and Agency Defendants remain bound by it with regard to the full, 1.36-million-acre Monument.

308. Since President Trump issued the 2026 Dismantling Proclamation, Agency Defendants have made a final decision to implement its revocation of the Monument, rather than the 2021 Restoration Proclamation, going forward. That decision marks the consummation of Agency Defendants' decision-making and is one from which legal consequences flow.

309. Upon information and belief, Agency Defendants have carried out that decision, and are violating and will continue to violate the 2021 Restoration Proclamation, by:

a. removing signs that delineate the Monument boundaries set by the 2021 Restoration Proclamation, thereby inviting development and mining claims on the lands the 2026 Dismantling Proclamation excluded;

b. managing the excluded lands as available for mineral exploration and development under the General Mining Act of 1872;

c. recording new hard rock mining claims located in the excluded lands, which the 2021 Restoration Proclamation prohibits, treating those claims as valid, and allowing mining activity on them to move forward;

d. allowing development on existing mining claims to move forward without the restrictions and protections required for claims on national monument lands; and

e. developing and implementing a monument management plan that incorporates the 2026 Dismantling Proclamation's revocation of the Monument's boundaries; and

f. failing to engage the Tribal Nations in development of a co-stewardship plan as required by the 2025 RMP.

310. Agency Defendants' actions implementing the 2026 Dismantling Proclamation's revocation of the Monument are arbitrary, capricious, not in accordance with law, and in excess of their authority. They carry out a proclamation the President had no authority to issue, and they violate the 2021 Restoration Proclamation, which remains in effect.

## PRAYER FOR RELIEF

WHEREFORE, the Tribal Nations respectfully request that the Court:

1. Declare that the 2026 Dismantling Proclamation exceeds the President's authority under the Antiquities Act, 54 U.S.C. § 320301, is ultra vires, and is void ab initio;
2. Declare that the 2026 Dismantling Proclamation violates the Property Clause,

U.S. Const. art. IV, § 3, cl. 2, and the separation of powers, U.S. Const. art. I, §§ 1, 7, and is void ab initio;

3. Declare that the 2021 Restoration Proclamation remains in effect and controls the objects comprising, the lands reserved as part of, and the management of Grand Staircase-Escalante National Monument;
4. Declare unlawful, and vacate and set aside, Agency Defendants' decision to implement the 2026 Dismantling Proclamation's revocation of the Monument;
5. Enjoin Agency Defendants from implementing the 2026 Dismantling Proclamation's revocation of Grand Staircase-Escalante National Monument, including through any management plan, transportation plan, or other plan premised on it, and from recording, processing, or treating as valid any mining claim located on, or approving any notice or plan of operations for, lands reserved by the 2021 Restoration Proclamation;
6. Declare that any mining claims, mineral leases, or other permits or authorizations premised on the validity of the 2026 Dismantling Proclamation are void ab initio;
7. Declare that, unless and until the 2025 RMP is lawfully amended, it remains in effect and governs all lands within its decision areas, including lands purportedly excluded from the Monument by the 2026 Dismantling Proclamation;
8. Award the Tribal Nations their fees and costs under 28 U.S.C. § 2412 or other applicable authority; and

9. Grant such other and further relief as the Court deems just and proper.

Dated: November 18, 2026

Respectfully submitted,

/s/ Joel West Williams
Joel West Williams
D.C. Bar 1023016
williams@narf.org

Leonard R. Powell
D.C. Bar 1048832
powell@narf.org

NATIVE AMERICAN RIGHTS FUND
950 F Street, NW, Suite 1050
Washington, DC 20004
202-785-4166

Matthew Campbell
D.C. Bar No. CO0060
mcampbell@narf.org

Beth Margaret Wright
CO Bar No. 55339*
wright@narf.org

NATIVE AMERICAN RIGHTS FUND
250 Arapahoe Ave.
Boulder, CO 80302
303-447-8760

*(D.D.C. admission pending)*

*Attorneys for Plaintiffs Kaibab Band of Paiute Indians, Paiute Indian Tribe of Utah, Ute Mountain Ute Tribe*